**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| MELODI NAVAB-SAFAVI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 08-1225 (ESH) |
| | ) |
| BROADCASTING BOARD OF | ) |
| GOVERNORS, *et al.*, | ) |
| | ) |
| Defendants. | ) |

_____)

## MEMORANDUM OPINION

Plaintiff Melodi Navab-Safavi worked as a contractor for the Broadcasting Board of

Governors ("BBG" or "the Board"), providing translation and other broadcasting support

services for the Persian Service and Persian News Network of the Voice of America ("VOA").

Plaintiff brings this action against the BBG and the following past or present BBG officers and

employees in their individual capacities: Janice H. Brambilla, Joaquin F. Blaya, Blanquita W.

Cullum, James K. Glassman, Wayne D. Greene, D. Jeffrey Hirschberg, Gary C. Hosford,

Edward E. Kaufman, Mark McKinnon, Mary Poggioli, Steven J. Simmons, Condoleezza Rice,

and Sheila Gandji ("the individual defendants").  Plaintiff alleges that her contract was

terminated due to her participation outside of work in an Internet music video protesting the Iraq

war, and that this termination violated the First Amendment's Speech Clause and constituted

discrimination on the basis of her race/ethnicity and national origin in violation of the Fifth

Amendment's Due Process Clause.  The individual defendants have moved to dismiss the claims

against them pursuant to Federal Rules of Civil Procedure 12(b)(2), (5), and (6).[1]  For the

reasons set forth below, defendants' motion will be granted in part and denied in part.

## BACKGROUND

### I.   FACTUAL ALLEGATIONS

As alleged in the complaint, plaintiff is a U.S. citizen and resident who was born in Iran.

(Compl. ¶ 2.)  She is fluent in English, Farsi (*i.e.*, Persian), Norwegian, and Swedish.  (*Id.* ¶ 5.)

Beginning in July 2004, plaintiff provided services as a contractor for the BBG.  (*Id.* ¶ 2.)  The

BBG is a federal agency charged with overseeing all U.S. government and government-

sponsored non-military international broadcasting services, including VOA.  (*Id.* ¶ 3.)  *See*

*generally* 22 U.S.C. § 6204.  The Board is a bipartisan independent body composed of nine

voting members: eight Governors appointed by the President (one of whom is appointed as

Chairman) and the Secretary of State.  *See* 22 U.S.C. § 6203(b).  At all times relevant to this

action, defendant Glassman was Chairman of the Board; defendants Blaya, Cullum, Hirschberg,

Kaufman, McKinnon and Simmons were Governors who also sat on the Board; defendant Rice

was a member of the Board by virtue of her position as Secretary of State; and defendants

Brambilla, Gandji, Greene, Hosford, and Poggioli were BBG employees.  (*Id.* ¶ 4.)

---

[1]  The motion also invokes Rule 12(b)(1), which permits dismissal for lack of subject matter jurisdiction.  However, defendants' papers do not expressly argue that this Court lacks subject matter jurisdiction, and since plaintiff brings her claims under the First and Fifth Amendments, it is unclear why defendants cite Rule 12(b)(1).  It is possible that defendants view qualified immunity to be a jurisdictional defense, but that would be incorrect.  *See Nevada v. Hicks*, 533 U.S. 353, 373 (2001) (rejecting suggestion that "the qualified immunity inquiry [is] part of the jurisdictional inquiry," because "it is not true" and "[t]here is no authority whatever for the proposition that absolute – and qualified – immunity defenses pertain to the [C]ourt's jurisdiction").

### A.      Plaintiff's Contract with the BBG

Under her contract with BBG, plaintiff agreed to provide translation and other assigned services to VOA's Persian Service.  (Compl. ¶ 5.)  The Persian Service, of which defendant Gandji was the director, produces news programs, features, and talk shows and, at the time plaintiff worked there, engaged at least twenty independent contractors for VOA productions. (*Id.* ¶¶ 5, 18.)  The "vast majority" of plaintiff's work was to translate material for VOA broadcasts from English into Farsi and to provide voiceover services (*i.e.*, narrating text that has already been approved by an editor).  (*Id.* ¶¶ 5, 17.)  From July 2004 through June 2006, plaintiff worked on VOA radio broadcasts; from June 2006 through her termination, plaintiff worked on VOA television broadcasts.  (*Id.* ¶ 5.)  For the television productions, plaintiff continued to serve primarily as a translator.  (*Id.*)  Although she did provide some technical support for the production of newscasts, plaintiff never appeared on a VOA television broadcast in that capacity. (*Id.*)  All of her work on translations, voiceovers, and other production services was reviewed by a VOA editor or producer.  (*Id.* ¶ 6.)

As a BBG contractor, plaintiff performed in a "consistently outstanding manner," and her contract was repeatedly renewed.  (Compl. ¶ 7.)  Joy Wagner, a VOA manager who frequently oversaw plaintiff's work as her direct supervisor, described plaintiff as "'by far one of the best translators in the Persian Service,'" whose "'work habits [were] impeccable'" and was, "'above all[,] . . . a team player'" who "'NEVER causes problems, [and] is always cooperative and willing to help.'"  (*Id.* (quoting Wagner's alleged statements); *see also id.* ¶ 17.)  Similarly, Amy Katz, an executive producer for VOA's Persian News Network, stated that plaintiff's "'work and work ethic are excellent on all levels'" and "'[h]er translation and writing won rave reviews from

our editors, as did her ability to adapt the printed word for television.'"  (*Id.* ¶ 7 (quoting Katz's alleged statements).)  The producer also highlighted how plaintiff's "'upbeat attitude, radiant smile and team spirit make her a pleasure to have around.'"  (*Id.*)  Another VOA manager offered praise for plaintiff's "'acumen, intelligence, thoroughness and honesty . . . .'"  (*Id.* (quoting manager's alleged statements).)  Many agents of the BBG discussed with plaintiff the possibility of "maintaining a long-term relationship with the agency."  (*Id.* ¶ 9.)  At no time prior to her termination did VOA, the Board, or any individual defendant indicate that plaintiff's performance "was less than fully satisfactory, or that her services would no longer be required."  (*Id.*)

**B.**     **The Music Video**

As a private citizen, plaintiff is a member of a pop band named Abjeez, whose other members reside in Sweden.  (Compl. ¶ 10.)  Abjeez, which is "banned in Iran," makes "songs and videos regarding, among other things, women's rights and other social problems in Iran."  (*Id.*)  Plaintiff never used VOA facilities or resources in any of the band's activities.  (*Id.* ¶ 12.)  VOA managers knew of and encouraged plaintiff's participation in Abjeez and broadcasted the band's music videos on occasion.  (*Id.* ¶ 11.)  VOA also televised a piece featuring Abjeez, during which plaintiff was interviewed as a guest.  (*Id.* ¶ 5.)  This was the only time plaintiff ever appeared on a VOA television broadcast.  (*Id.*)

In early July 2007, Abjeez produced and appeared in a music video entitled "DemoKracy" ("the video").  (Compl. ¶ 13.)  The video "protested U.S. involvement in the Iraq War" and contains footage of wounded U.S. soldiers, injured and dead Iraqi civilians, and coffins draped in U.S. flags.  (*Id.*)  The song does not mention VOA, and the video does not portray

4

VOA activities or employees, nor does it identify by name or professional affiliation any of the artists involved with the video.  (*Id.* ¶ 14.)  The band has not sold or commercially distributed the video.  (*Id.*)  Plaintiff used no VOA resources to make the video and participated in its production "only during non-work hours and on her days off."  (*Id.*)  Plaintiff's husband, Saman Arbabi, also helped to produce the video; although he is a BBG employee working in VOA's Persian Service, his participation was also "exclusively on his own time using his own resources."  (*Id.* ¶ 22.)

### C.      The Termination of Plaintiff's Contract

On June 26, 2007, the Board renewed plaintiff's contract and authorized additional funds to be paid pursuant to that contract.  (Compl. ¶ 8.)  On July 9, plaintiff's music video was posted to the publicly accessible Internet website YouTube.  (*Id.* ¶ 13.)  Shortly thereafter, U.S. Senator Tom Coburn learned about the video and, "either directly or through his staff, used his influence as a Senator to lobby BBG officials to punish those people affiliated with the video."  (*Id.* ¶ 21.)  When Gandji learned about Arbabi's involvement in the video, she and Poggioli, an official in the BBG's Labor Relations office, investigated the circumstances surrounding the making of the video.  (*Id.* ¶ 22.)  They met with Arbabi and pressured him to resign, telling him that "even though they had verified that he had not used any VOA resources to produce the video, BBG management did not want 'a scandal on its hands' because it might affect Congressional funding of the agency."  (*Id.*)  A meeting of the Board was also convened to review and discuss the video; during this meeting, members of the Board "expressed their view that the DemoKracy video was 'anti-American.'"  (*Id.* ¶ 16.)

On July 18, 2007, Gandji and Poggioli met again with Arbabi.  (Compl. ¶ 22.)  During

this second meeting, Poggioli informed Arbabi that the Board had met to discuss the video and "judged it to be 'anti-American,'" and that the Board members saw Arbabi "'as a liability.'" (*Id.*)  Gandji also told Arbabi that "Senator Coburn was 'leading the attack' to take action against those people involved in producing it."  (*Id.*)  Arbabi refused to resign.  (*Id.*)  Around this time, Joy Wagner, plaintiff's direct supervisor, also learned that the Board had concerns about the video, and she wrote to Gandji to clarify plaintiff's "limited job responsibilities."  (*Id.* ¶ 17.) Wagner allegedly explained that plaintiff was not a journalist, and that she only provided translation and narration services, that she never "'appeared on-air as a[] VOA employee,'" and that she specifically asked that VOA "'never use her real name on air,'" a request that had been honored.  (*Id.* (quoting Wagner's alleged writing).)

On July 19, 2007, plaintiff was summoned to a meeting with Benjamin Jones Keeling, Staff Director of the Persian News Network, and Gandji, Greene, and Hosford.  (Compl. ¶ 18.) Hosford allegedly told plaintiff, "'[T]oday we are terminating your contract with VOA.  We have used your services for the past three years, but from now on we don't need them any longer.'" (*Id.* (quoting Hosford's alleged statements).)  Hosford then pressured plaintiff to sign a form acknowledging that the termination of her contract was to be effective at midnight that night, even though this breached the contract's 30-day written notice provision.  (*Id.* ¶¶ 18-19; *see also* Defs.' Mem. in Supp. of Mot. to Dismiss ("Mot.") [Dkt. 12], Ex. 2 (plaintiff's contract) at 2 ("Either Party may terminate this contract in whole or in part when it's in that Party's interest, by prior written notice, received at least 30 days before the effective date of termination.").)  After packing her belongings and bidding her colleagues farewell, plaintiff returned to Gandji's office to sign termination-related paperwork.  (*Id.* ¶ 20.)  Gandji told plaintiff, "'[T]his situation is very

unfortunate.  If this had happened in another service, like the Mandarin service, nothing would

have happened.  But since you are Iranian, working at the Persian [S]ervice during these

sensitive political times with Iran, this has become a disproportionate problem for you.'"  (*Id.*

(quoting Gandji's alleged statements).)  Following plaintiff's termination, defendants "repeatedly

hired other independent contractors to provide the very same services that plaintiff had

performed."  (*Id.* ¶ 24.)  On September 12, VOA corresponded with Senator Barbara Mikulski

about the DemoKracy video, stating that the video was "'public speaking on a matter of concern

to the Agency" and that VOA was "'satisfied that all production was accomplished off-site, and

that no VOA resources were utilized.'"  (*Id.* ¶¶ 14, 15 (quoting VOA's alleged writing).)

## II.    THE INSTANT ACTION

Plaintiff initiated this action on July 17, 2008.  Count One of the complaint alleges that

defendants' actions violated plaintiff's right to freedom of speech under the First Amendment.

(Compl. ¶ 28.)  Count Two alleges that their actions violated plaintiff's equal protection rights

under the Fifth Amendment's Due Process Clause.  (*See id.* ¶ 31.)  The complaint further alleges

that defendants acted willfully, maliciously, and with reckless disregard for her rights, and that

they intended and caused her significant harm, including loss of income, reputational damage,

and emotional distress.  (*Id.* ¶¶ 26, 29, 32.)  Plaintiff seeks, *inter alia*, a declaration that

defendants violated her constitutional rights, an injunction against further violations of those

rights, and an award of consequential and compensatory damages.  (*Id.* at 11 ¶¶ (1)-(3) (prayer

for relief).)  On October 31, the agency filed its answer to the complaint, and on February 4,

2009, the individual defendants moved to dismiss, contending that the Court lacks personal

jurisdiction over several defendants and that plaintiff cannot state valid claims for relief against

the individual defendants because they enjoy qualified immunity from suit and because plaintiff

cannot recover monetary damages against them under *Bivens v. Six Unknown Named Agents of*

*Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

## ANALYSIS

### I.      STANDARD OF REVIEW

#### A.      Rule 12(b)(2)

Although plaintiff has the burden of proving personal jurisdiction, she can satisfy that

burden with a *prima facie* showing.  *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005).  To

establish a *prima facie* case, plaintiff "may rest [her] argument on [her] pleadings, bolstered by

such affidavits and other written materials as [she] can otherwise obtain."  *Ventura v. BEBO*

*Foods, Inc.*, 595 F. Supp. 2d 77, 82 (D.D.C. 2009).  "[A] plaintiff 'is entitled to reasonable

discovery' if the plaintiff requests it.  *City of Moundridge, Kan. v. Exxon Mobil Corp.*, 471 F.

Supp. 2d 20, 33 n.5 (D.D.C. 2007) (quoting *Second Amendment Found. v. U.S. Conference of*

*Mayors*, 274 F.3d 521, 525 (D.C. Cir. 2001)).  A plaintiff may make such a request through

motion or when defending against a motion to dismiss.  *Cf. Second Amendment Found.*, 274 F.3d

at 525 (declining to consider argument that district court erroneously denied jurisdictional

discovery where plaintiff "neither moved for an opportunity to serve jurisdictional discovery nor

defended against the [defendants'] motion to dismiss on the ground that it had not yet taken such

discovery").

#### B.      Rule 12(b)(5)

"Before a federal court may exercise personal jurisdiction over a defendant, the

procedural requirement of service of summons must be satisfied."  *Omni Capital Int'l, Ltd. v.*

*Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987).  If a plaintiff does not properly effect service, then the defendant may move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(5).  *Hilska v. Jones*, 217 F.R.D. 16, 20 (D.D.C. 2003).  Upon such a motion, "'[t]he party on whose behalf service is made has the burden of establishing its validity when challenged; to do so, he must demonstrate that the procedure employed satisfied the requirements of the relevant portions of [Federal] Rule [of Civil Procedure] 4 and any other applicable provision of law." *Light v. Wolf*, 816 F.2d 746, 751 (D.C. Cir. 1987) (quoting C. Wright & A. Miller, Federal Practice and Procedure § 1083 at 334 (1969)); *accord Cruz-Packer v. District of Columbia*, 539 F. Supp. 2d 181, 186 (D.D.C. 2008).

### C.     Rule 12(b)(6)

"In determining whether a complaint fails to state a claim, [courts] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] . . . matters of which [courts] may take judicial notice," *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997), and documents "appended to [a motion to dismiss] and whose authenticity is not disputed" if they are "referred to in the complaint and are integral" to a plaintiff's claim.  *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (considering content of documents on motion to dismiss where complaint relied on documents' terms and where documents were judicially noticeable); *see also Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009) (noting that matters outside the pleadings do not include "documents 'upon which the plaintiff's complaint necessarily relies' even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss" (quoting *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998)).  When ruling on a

motion to dismiss pursuant to Rule 12(b)(6), courts must first assume the veracity of all "well-pleaded factual allegations" contained in the complaint. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009); *see also Atherton v. Dist. of Columbia Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009). Next, courts must determine whether the allegations "plausibly give rise to an entitlement to relief" by presenting "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" in that "the court [can] draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949-50 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## II.   PERSONAL JURISDICTION AND SERVICE OF PROCESS

Defendants argue that the Court lacks personal jurisdiction over defendants Blaya, Cullum, Glassman, McKinnon, Poggioli, and Simmons because they do not reside in the District of Columbia ("the non-resident defendants"), and that the Court also lacks personal jurisdiction over defendants Glassman, Poggioli, and Rice, who are no longer affiliated with the BBG, because plaintiff has failed to properly serve them. (Mot. at 18-22.) The Court will address these arguments in turn.

### A.   The Court Has Personal Jurisdiction over the Non-Resident Defendants under the D.C. Long-Arm Statute.

"If a defendant does not reside within or maintain a principal place of business in the District of Columbia, then the District's long-arm statute, D.C. Code § 13-423, provides the only basis [o]n which a court may exercise personal jurisdiction over the defendant." *Quality Air Servs., L.L.C. v. Milwaukee Valve Co., Inc.*, 567 F. Supp. 2d 96, 99 (D.D.C. 2008) (quoting *Savage v. Bioport*, 460 F. Supp. 2d 55, 60 (D.D.C. 2006)). Section 13-423 provides in relevant part:

> A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's-
>
> (1) transacting any business in the District of Columbia; . . .
>
> (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia . . . .

D.C. Code §§ 13-423(a)(1) & (3).  "Section (a)(1)'s 'transacting any business' clause generally has been interpreted to be coextensive with the Constitution's due process requirements" and therefore they "merge into a single inquiry."  *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000) (internal citations omitted).  Section (a)(3) "confers jurisdiction only over a defendant who commits an act in the District which causes an injury in the District, without regard to any other contacts."  *Moncrief v. Lexington Herald-Leader Co.*, 807 F.2d 217, 221 (D.C. Cir. 1986).

The complaint asserts that the non-resident defendants were all members or employees of the Board of Governors when they allegedly participated in the termination of plaintiff's contract.  (*See* Compl. ¶ 4.)  Defendants contend that their presence in D.C. for work purposes cannot provide the basis for the Court to assert personal jurisdiction over them because plaintiff's *Bivens* action only names them in their individual capacities.  (Mot. at 18-19.)  However, the cases that defendants cite stand only for the proposition that the Court cannot assert personal jurisdiction over a non-resident defendant (1) *who did not work in D.C.* at the time of the conduct at issue and (2) whose only other D.C. contacts consist of federal employment or other "official capacity" relationships.  *See Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 57-58 (D.D.C. 2005) (finding no personal jurisdiction over defendant who lived and worked in Missouri where his sole contact with D.C. was employment by Internal Revenue Service, which is headquartered here); *Cornell v. Kellner*, 539 F. Supp. 2d 311, 315 (D.D.C.

11

2008) (same with respect to IRS employees who were Arizona residents, where plaintiff did not allege "that his claim for relief arises from Defendant's transaction of business in the District of Columbia," nor did he offer evidence that defendants committed any acts in D.C. with a "nexus to [p]laintiff's cause of action"); *Ali v. District of Columbia*, 278 F.3d 1, 7 (D.C. Cir. 2002) (finding no personal jurisdiction over Virginia officials in action brought under 42 U.S.C. § 1983, where complaint did not allege that "any defendants acting in their individual capacities either transacted business in the District or contracted to do so," officials' only contacts with District were through official relationships with District officials, and tortious acts took place in Virginia).

Unlike these cases, the non-resident defendants transacted business here, and this business had a strong "nexus to [p]laintiff's cause of action" because their alleged involvement in the decision to terminate her contract forms the basis for her retaliation and discrimination claims. *Cornell*, 539 F. Supp. 2d at 315.  Because these defendants transacted business in the District within the meaning of § 13-423(a)(1), they had sufficient contact to provide the Court with personal jurisdiction over them.

In the alternative, the Court has jurisdiction over the non-resident defendants pursuant to § 13-423(a)(3).  Plaintiff alleges that the non-resident defendants caused her financial, reputational, and emotional harm through the commission of a constitutional tort consisting of the decision, made in the District, to terminate her contract because of her constitutionally protected conduct and status.  (*See* Compl. ¶¶ 26, 29, 32.)  It is enough that defendants "were physically within the District when they took the alleged actions" giving rise to plaintiff's constitutional tort claims.  *Wormley v. United States*, 601 F. Supp. 2d 27, 33 (D.D.C. 2009)

(Lamberth, C.J.) (holding that personal jurisdiction was proper under § 13-423(a)(3) over non-resident federal defendants in *Bivens* action).

> **B.     The Court Presently Lacks Personal Jurisdiction over Glassman, Poggioli, and Rice, but Will Extend the Time for Plaintiff to Serve Them.**

Plaintiff concedes that she has not yet served Glassman, Poggioli, and Rice because she has been unable to identify the address where they can be served in their individual capacity. However, in light of plaintiff's good faith efforts to obtain such addresses (*see* Pl.'s Opp'n to Mot. ("Opp'n") [Dkt. 18] at 42-43), if plaintiff wants to proceed against any of these individuals, the Court will extend for good cause the time for service.  *See* Fed. R. Civ. P. 4(m).

## III.   PERSONAL INVOLVEMENT OF BLAYA, CULLUM, HIRSCHBERG, KAUFMAN, AND RICE

Defendants argue that plaintiff does not have a "viable claim" against Blaya, Cullum, Hirschberg, Kaufman, and Rice because they had "no direct or personal involvement" in the decision to terminate plaintiff's contract.  (Mot. at 16.)  Specifically, they argue that Rice did not attend Board meetings or participate in Board business or decisions, and that "there is no plausible basis to infer that Ms. Rice knew [p]laintiff's name, knew that she performed services as an independent contractor for the Voice of America, was aware of her video, or had any personal involvement in the termination decision."  (*Id.* at 17.)  Defendants also assert that there was no meeting attended by "all of the [G]overnors, at which the [G]overnors discussed [p]laintiff's contract and the DemoKracy video," and that Blaya, Cullum, Hirschberg, and Kaufman did not attend any meetings involving plaintiff's video or contract, nor were they involved in any decision regarding contract.  (*Id.* at 17-18.)

These arguments are supported with declarations from Blaya, Cullum, Hirschberg, and

Kaufman.  However, defendants have moved to dismiss under Rule 12(b)(6), and as such, the

Court's analysis is confined to the well-pleaded facts alleged in the complaint, which are

assumed to be true, and the Court will not, at this time, consider these declarations by converting

defendants' motion into one for summary judgment.  Rather, it is sufficient that the complaint

alleges (1) that a meeting of the Board was convened "to view and discuss" plaintiff's video,

during which some members of the Board expressed a view that the video was "'anti-

American,'" and (2) that defendants, collectively, terminated plaintiff's contract.  (Compl. ¶¶ 16,

25.)

## IV.    QUALIFIED IMMUNITY ANALYSIS

Under the doctrine of qualified immunity, "government officials performing discretionary

functions generally are shielded from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would

have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "The doctrine recognizes the

hardships of subjecting public officials to the rigors of litigation, but it balances that concern

against the interest in allowing citizens to vindicate their constitutional rights." *Barham v.*

*Ramsey*, 434 F.3d 565, 572 (D.C. Cir. 2006).  To determine whether defendants are entitled to

qualified immunity, the Court looks to (1) whether plaintiff's allegations, if taken as true, show

that defendants' conduct violated a constitutional right, and (2) whether that right was "clearly

established" at the time of the defendant's alleged misconduct.[2] *Saucier v. Katz*, 533 U.S. 194,

201 (2001).  If the alleged conduct does not violate such a clearly established right, qualified

immunity applies. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

---

[2] The Court may exercise its discretion to address the two-prong inquiry in whatever
sequence it deems appropriate. *See Pearson v. Callahan*, 129 S. Ct. 808, 817 (2009).

14

Plaintiff alleges that defendants terminated her contract because of her speech as a private person on a matter of public concern and because of her race/ethnicity (*i.e.*, Persian) and national origin (*i.e.*, Iranian).[3]  (Compl. ¶¶ 15, 25.)  As explained herein, the Court finds that plaintiff has stated violations of clearly established rights under the First and Fifth Amendments, and therefore, defendants are not shielded by the doctrine of qualified immunity.

## A.      Count One - First Amendment

### 1.      Violation of plaintiff's rights

"[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out."[4]  *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citing *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998)) (citations omitted).  In particular, it has long been established that "public employees do not surrender all their First Amendment rights by reason of their employment."  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006); *see, e.g.*, *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563 (1968).  "[A] citizen who works for the government is nonetheless a citizen.  The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private

---

[3] For convenience, the Court will hereinafter refer to plaintiff's equal protection claim as one based on her "race."  *Cf. Iqbal*, 129 S. Ct. 1937 (discussing Pakistani's equal protection claims of discrimination on the basis of race and national origin); *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 607, 613 n.5 (1987) (holding that Iraqi-born U.S. citizen properly stated claim for racial discrimination under 42 U.S.C. § 1981 where he alleged that employer discharged him because of his Arab ancestry, and citing cases where discrimination on basis of ancestry constituted equal protection violations).

[4] Music merits First Amendment protection, *see Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65-66 (1981); *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 569 (1995), and there is "no basis for qualifying the level of First Amendment scrutiny that should be applied to [the Internet] medium."  *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997).

citizens.  So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively."  *Garcetti*, 547 U.S. at 419 (citations omitted).

**a)**     **First Amendment rights of contractors**

The "existing framework for government employee cases" that was first articulated in *Pickering* applies with equal force to independent government contractors.  *Bd. of County Comm'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668, 677 (1996); *see also O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714-15 (1996) (holding that government may not retaliate against contractors or "regular provider[s] of services" for exercising First Amendment rights of political association or expression of political allegiance "unless political affiliation is a reasonably appropriate requirement for the [services] in question").  As with employees, contractors may not be terminated for exercising their First Amendment rights unless the government's legitimate interests as a contracting party outweigh the free speech interests at stake.  *See Umbehr*, 518 U.S. at 685-86.  To establish that her speech is protected under the First Amendment, plaintiff must show (1) that she "spoke as a citizen on a matter of public concern," *Garcetti*, 547 U.S. at 418, and (2) that "the termination of [her] contract was motivated by [her] speech on a matter of public concern . . . ."  *Umbehr*, 518 U.S. at 685.  Defendants can respond with the defense (3) that "in light of their knowledge, perceptions, and policies at the time of the termination, [they] would have terminated the contract regardless of [plaintiff's] speech," or (4) that the government's "legitimate interests as contractor, deferentially viewed, outweigh the free speech interests at stake."  *Id.*

Neither the first nor second prong of this inquiry is presently disputed, because

16

defendants concede that "[p]laintiff's appearance in the DemoKracy music video appears to have involved speech as private citizen on a matter of public concern," and they "assume for purposes of this motion that the video was a motivating factor in the decision to terminate plaintiff's contract." (Mot. at 10.)  As for the third prong, defendants do not contend that they would have terminated the contract regardless of plaintiff's speech.  Accordingly, the Court need only examine whether the government has, under the fourth prong, met its burden to show that plaintiff's interests in speaking as a citizen on a matter of public concern were outweighed by the government's interest, "'as an employer, in promoting the efficiency of the public services it performs through its employees.'"  *Umbehr*, 518 U.S. at 676 (quoting *Pickering*, 391 U.S. at 568); *Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (government bears burden of "justifying the discharge on legitimate grounds").

**b)**   ***Pickering* balancing**

"In performing the balancing, [plaintiff's] statement will not be considered in a vacuum; the manner, time, and place of [her] expression are relevant, as is the context in which the dispute arose."  *Rankin*, 483 U.S. at 388; *see also O'Donnell v. Barry*, 148 F.3d 1126, 1134 (D.C. Cir. 1998).  On the other side of the balance, "the state interest element of the test focuses on the effective functioning of the public employer's enterprise."  *Rankin*, 483 U.S. at 388.  The Court may consider (1) "whether the statement impairs discipline by superiors or harmony among co-workers," (2) "has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary," (3) "or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."  *Id.*

### i)       **Plaintiff's interests**

The government's "burden in justifying a particular discharge varies depending upon the nature of the employee's expression." *Connick v. Myers*, 461 U.S. 138, 150 (1983).  First, it is beyond dispute that plaintiff's music video, which addressed U.S. involvement in Iraq, is speech on a matter of public concern.  "Songs play no less a role in public debate, whether they eulogize the John Brown of the abolitionist movement, or the Joe Hill of the union movement, [or] provide a rallying cry such as 'We Shall Overcome' . . . ." *Yale Broad. Co. v. Fed. Commc'ns Comm'n*, 414 U.S. 914, 918 (1973) (Douglas, J., dissenting from denial of certiorari).  Second, plaintiff's publicly minded speech was made in a strictly private capacity.  Defendants concede that the video does not implicate the subject matter of plaintiff's contract.  (*See* Mot. at 10 ("appearing in music videos was not within the scope of plaintiff's contractual duties").)  In addition, plaintiff alleges that she produced the video entirely on her own time, without using any VOA resources or facilities, and that the video neither mentions VOA nor portrays any VOA activities or employees, nor does it identify any of the artists, let alone suggest that plaintiff worked for the BBG.  (Compl. ¶¶ 12, 14.)  *Cf. City of San Diego v. Roe*, 543 U.S. 77, 81, 84 (2004) (police officer's Internet videos were neither speech as private citizen nor did they address matter of public concern, because they showed him engaging in sexually explicit acts while in uniform and he "took deliberate steps" to link that speech to "his official status as a police officer").

What makes this case noteworthy is that plaintiff's speech was "made outside the workplace[] and involved content . . . unrelated to [her] government employment." *United States v. Nat'l Treasury Employees Union* ("*NTEU*"), 513 U.S. 454, 466 (1995).  By contrast, *Pickering*

and its progeny primarily addressed government employees' criticisms of policies or actions of

their immediate supervisors or coworkers.  *See* 391 U.S. at 564 (teacher's letter to local

newspaper criticizing school board funding policies); *Perry v. Sindermann*, 408 U.S. 593, 595

(1972) (state junior college professor's criticism of Board of Regents' refusal to elevate college

to four-year status); *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 282 (1977) (teacher's

criticism of school policy on teacher dress and appearance); *Givhan v. W. Line Consol. Sch.*

*Dist.*, 439 U.S. 410, 413 (1979) (teacher's complaints about school board policies and practices

perceived to be racially discriminatory); *Connick*, 461 U.S. at 149 (assistant district attorney's

distribution of workplace questionnaire asking whether coworkers felt pressured to work on

office-supported political campaigns); *Waters v. Churchill*, 511 U.S. 661, 680 (1994) (plurality

op.) (assuming without deciding that obstetrics nurse's criticisms of obstetrics department and

supervisor was speech of public concern).  Even *Umbehr* involved a plaintiff who contracted

with a county to provide trash hauling services yet remained a vocal critic of the county and its

board of commissioners regarding issues related to his services.  *See* 518 U.S. at 670-71.  Unlike

these cases, plaintiff's video does not criticize VOA.[5]  And while *Rankin* is the only Supreme

---

[5] Defendants included a copy of the video with their motion.  (*See* Mot., Ex. 3.)  Because the video is a document upon which the complaint necessarily relies, and because plaintiff does not dispute its authenticity, the Court may consider the video without converting defendants' motion to dismiss into a motion for summary judgment.  *See Kaempe*, 367 F.3d at 965.  The video shows a news anchor, a weatherperson, and a field reporter singing and footage of the Iraq war and its human toll.  The song, set to a reggae beat, is not in English.  However, the video also has English captions and graphics, including text that scrolls along from right to left at the bottom of the screen, in the manner seen on many cable news networks.  Based on the rhyme scheme and repetition of phrases, these words appear to be translations of the lyrics being sung:

There's a fresh fruit in market / dictatorship is wiped off target
We've brought a new fruit load / democracy is what we swallowed

Fresh fruit of year is called "democracy" / served in a bowl, but tastes like hypocrisy
When its season comes here / find it in stockpiles close by near

Court case to have "directly applied the *Pickering* balancing test to speech whose content had

nothing to do with the workplace," *NTEU*, 513 U.S. at 466 n.10, the protected speech in *Rankin*

– comments by an employee in a constable's office about an attempted presidential assassination

– did take place at work, unlike the speech here.  *See* 483 U.S. at 381-82.

Plaintiff's video most closely resembles the speech at issue in *NTEU*, where the Court

invalidated a statute that prohibited rank-and-file government employees from accepting

compensation for making speeches or writing articles, even those with no connection to an

employee's official duties.  513 U.S. at 457.  Although that case involved a prior restraint on

federal employees as a class instead of "a *post hoc* analysis of one employee's speech and its

impact on that employee's public responsibilities," the Court made clear that *Pickering*'s

balancing test was generally applicable to claims that the government has attempted to restrict

the speech of its workforce.  *Id.* at 466-67.  In assessing the character of the *NTEU* employees'

speech, the Court noted that their employment status "ha[d] no more bearing on the quality or

market value of their [creative] output" than did the government employment of authors Bret

Harte, Nathaniel Hawthorne, Herman Melville, and Walt Whitman, all of whom had worked for

federal agencies while writing and publishing "in their spare time."  *Id.* at 464-65.  The content

---

Oh? Eh! O-E-O-E-O

In many places sold to you by force / wrapped neatly, labeled by its source
If you refuse to "stay the course" / they shove it in your throat

Seems buying it is the only way / this fruit tastes different everywhere
Ripe and ready in the yard / tastes like flaming lead falling hard

Kilo by kilo everywhere exported / promptly wrapped, swiftly transported
Soon it's your time as season comes near / they plant it in your garden right here

Now that it's become an "export product" / it'll come to you want it or not

(*See generally* Mot., Ex. 3 (repeated lyrics and ellipses omitted; formatting added).)

of the employees' speech also had "nothing to do with their jobs" and addressed "segments of

the general public," as opposed to "audiences composed of co-workers or supervisors . . . ." *Id.*

at 465.

Like the *NTEU* employees, plaintiff's workplace identity had no bearing on the value of

her speech, as she was not identified in her video by name or professional affiliation, thus

leaving her message to compete in the marketplace of ideas on its own merits.  And like the

speech at issue in *NTEU*, plaintiff addressed the general public on a matter having nothing to do

with her job.  In short, the content, manner, time, and place of plaintiff's speech creates no direct

"nexus to Government employment." *NTEU*, 513 U.S. at 474.  *Cf. Roe*, 543 U.S. at 80-81

(distinguishing *NTEU* as inapplicable to sexually explicit Internet video where employee did not

"confin[e] his activities to speech unrelated to his employment" and instead "took deliberate

steps to link his videos and other wares to his police work, all in a way injurious to his

employer").  At most, plaintiff's speech could only have an *indirect* nexus to her workplace by

virtue of an "adverse impact on the efficiency of the office[] in which [plaintiff] work[ed],"

*NTEU*, 513 U.S. at 465, and thus, the Court will now consider defendants' claims that plaintiff's

speech disrupted workplace efficiency.

### ii)   The government's interests

"As the magnitude of intrusion on employees' interests rises, so does the Government's

burden of justification." *NTEU*, 513 U.S. at 483.  Defendants must make a particularly "strong[]

showing" that they had a legitimate interest in terminating plaintiff's contract because her speech

"substantially involved matters of public concern." *Connick*, 461 U.S. at 152; *accord Am. Postal

Workers Union v. U.S. Postal Servs.* ("*APWU*"), 830 F.2d 294, 304 n.13 (D.C. Cir. 1987).  In

addition, "[t]he less [a plaintiff's] speech has to do with the office, the less justification the office is likely to have to regulate it." *Eberhardt v. O'Malley*, 17 F.3d 1023, 1027 (7th Cir. 1994) (Posner, J.) (reversing dismissal of First Amendment claims).  As even the dissenters in *NTEU* recognized, "the Government's interests are at their lowest ebb" where the content of employees' off-duty speech is not related to their professional duties.  513 U.S. at 494 (Rehnquist, C.J., dissenting).

First, because plaintiff's speech "does not involve the subject matter of Government employment and [took] place outside the workplace," defendants cannot justify their actions "on the grounds of immediate workplace disruption asserted in *Pickering* and the cases that followed it."  *NTEU*, 513 U.S. at 470.  In other words, because the video was "in no way directed towards any person with whom [she] would normally be in contact in the course of [her] daily work as a [translator]," there is "no question of maintaining either discipline by immediate superiors or harmony among coworkers . . . ."  *Pickering*, 391 U.S. at 569-70; *see also Connick*, 461 U.S. at 153 n.13 ("Employee speech which transpires entirely on the employee's own time, and in nonwork areas . . . , bring[s] different factors into the *Pickering* calculus, and might lead to a different conclusion [regarding workplace disruption]."); *cf. Rankin*, 483 U.S. at 388-89 (noting that despite employee's speech in the workplace, "there [was] no evidence that it interfered with the efficient functioning of the office").  Nor is there any indication of such a concern; to the contrary, the complaint alleges that plaintiff's immediate supervisors held her in high regard, with one VOA manager stating that "'if I had the authority, I would rehire her immediately.'" (Compl. ¶ 7.)

Second, there is nothing in the complaint to suggest that plaintiff's relationships at VOA

were "the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." *Pickering*, 391 U.S. at 570; *cf. Am. Fed'n of Gov't Employees v. District of Columbia*, No. 05-CV-472, 2005 WL 1017877, at *9 (D.D.C. May 2, 2005) (concluding that personal loyalty was not necessary to enable D.C. Department of Fire and Emergency Medical Services' "efficient[] and effective[]" delivery of emergency medical services, where there was "nothing in the record to suggest that the personal loyalty of the [plaintiff] Union members – paramedics and EMTs – or officers to the Chief [was] necessary to enable" adequate provision of those services). Moreover, even if she had such relationships, there is no allegation that *plaintiff's video* had a detrimental impact on them.[6] *See Rankin*, 483 U.S. at 388 (asking whether "the statement" affects workplace harmony, close working relationships, or operational efficiency).

Thus, defendants are left to contend that the video impeded "the performance of [plaintiff's] duties or interfere[d] with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388. Specifically, they argue that "the BBG's legitimate interest in protecting the journalistic integrity and credibility of Voice of America programming outweighed [p]laintiff's interest in appearing in the video." (Mot. at 10.) The Court cannot agree.

With respect to the performance of plaintiff's duties, her termination might have been justified if her speech "demonstrated a character trait that made [her] unfit to perform her work." *Rankin*, 483 U.S. at 389. Defendants argue that "by speaking out against an ongoing war, in a

---

[6] In addition, because plaintiff's speech did not consist of public criticism of her superiors, it is unclear whether the existence of a "close working relationship[]" would matter. *Pickering* contemplated that such relationships "between superior and subordinate" would be "of such a personal and intimate nature that *certain forms of public criticism* of the superior by the subordinate would seriously undermine the working relationship between them . . . ." 391 U.S. at 570 n.3 (emphasis added).

video that spoofed the Voice of America news broadcast, [p]laintiff drew her objectivity into question." (Defs.' Reply in Supp. of Mot. ("Reply") [Dkt. 21] at 16.) They suggest that part of plaintiff's job as a VOA translator was "to provide accurate and objective translations of the statements made by reporters, interviewees, and other speakers." (Mot. at 11.) They also contend that "[c]hoosing the correct words to correctly translate stories from one language to another involves constant editorial judgments" (Reply at 16), and that "[i]f she was biased, or had a conflict of interest, neither the audience *nor her supervisors* could trust the accuracy and impartiality of her translation of those statements." (Mot. at 11 (emphasis added).) Even accepting defendants' characterizations of plaintiff's responsibilities and the potential for the exercise of editorial judgments when translating, "there is no demonstration here that the [video] impeded [plaintiff's] ability to perform her responsibilities." *Connick*, 461 U.S. at 151. Defendants' *speculation* that plaintiff's "neutrality and objectivity ha[ve] been compromised" (Mot. at 13) does not provide any basis to infer that plaintiff ever mistranslated anything, that her translations were found to be biased, or that the audience perceived such bias in her translations. Nor could such evidence be considered on a motion to dismiss given plaintiff's allegations regarding the praise that she received for her job performance. (*See* Compl. ¶¶ 6-7.) At this stage, all that defendants can argue is that they could not trust plaintiff to provide unbiased translations because she spoke "against an ongoing war" in a video that they characterize as "spoof[ing]" a VOA news broadcast (Reply at 16), but the Court rejects this unsupported premise.[7] *Cf. Rankin*, 483 U.S. at 379-80, 388-89 (holding that deputy constable was improperly

---

[7] The Court also rejects the notion that the video "spoofed" a VOA broadcast. Defendants suggest that plaintiff's video "exactly replicated . . . Studio 50 of the Persian News Network, thereby creating the appearance that portions of the video were shot at a Voice of America studio," and featured her "acting as if she were a news anchor during a Voice of

discharged "for remarking, after hearing of an attempt on the life of the President, 'If they go for him again, I hope they get him,'" and observing that although her statement "was made at the workplace, there is no evidence that it interfered with the efficient functioning of the office").

Therefore, the only remaining question is whether plaintiff interfered with VOA's regular operation because it "discredited the office by making her statement in public." *Rankin*, 483 U.S. at 389.  Defendants argue that "the BBG's interest in preserving its credibility as an objective source of news outweighs [p]laintiff's interest in making the video while retaining her contract."[8]  (Reply at 16.)  Specifically, they suggest that if VOA had retained plaintiff even after she had produced and appeared in her video, it would have "compromised [VOA's] journalistic

America newscast."  (Mot. at 12.)  To the extent that this is not a legal question but a factual one, it cannot be resolved on a motion to dismiss.  To the extent that it is a legal question, the Court finds defendants' argument unpersuasive.  First, having compared defendants' proffered screen capture of a Persian News Network broadcast with the news studio depicted in the music video (*see* Mot., Exs. 3 & 4), the Court observes no similarity between the two studios that cannot be attributed to their common resemblance to the generic modern television newsroom; for example, a monitor in the background of the VOA studio depicts what appears to be a CNN broadcast from a similar newsroom.  (*See id.*, Ex. 4 at 1.)  Second, the Court takes judicial notice of the fact that many television news broadcasts feature an anchorperson sitting behind a desk and delivering news or commentary.  Nothing in the complaint suggests that the singer in plaintiff's video was specifically imitating a VOA anchor.

[8] Defendants also argue that "requiring the BBG to retain a translator who has engaged in such conduct would compromise the freedom of the press."  (Mem. at 13.)  Regardless of the historical complexities in defining the scope of that freedom, it has no application to the BBG or VOA.  "A free press stands as one of the great interpreters *between the government and the people*," assisting "the circulation of information to which the public is entitled in virtue of the constitutional guaranties," *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936) (emphasis added), in order to "assure[] the maintenance of our political system and an open society." *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967).  The BBG and VOA are *government entities* whose broadcasts are directed outside the United States, *see* 22 U.S.C. § 1461-1a (banning non-archival domestic activities by BBG's predecessor agency), so they do not stand "between the government and the people" as facilitators of public discourse.  But even if there were a countervailing First Amendment interest on the government's side of the scale, this "does not . . . automatically forfeit the employee's right to speak out on a matter of public concern.  Rather, a *Pickering* balancing test would still be necessary, to weigh the actual and relative harms to both [F]irst [A]mendment interests." *APWU*, 830 F.2d at 303 n.10.

integrity and credibility" and conflicted with the statutory mandate that VOA broadcasts be

governed by principles of reliability, objectivity, and balance.  (Mot. at 11.)  *See also* 22 U.S.C §

6202(c).  While the Court recognizes that the legitimacy of this concern for preserving the

public's confidence in the BBG's broadcasting services, *see APWU*, 830 F.2d at 303 (noting that

government's asserted interest in "the 'public's confidence in the confidentiality of the

mailstream'" was "[o]bviously" a legitimate concern), there is no basis at this stage for

concluding that plaintiff's speech impaired "'the efficiency of the public services'" that BBG and

VOA "'perform[] through [their] employees.'"[9]  *Umbehr*, 518 U.S. at 676 (quoting *Pickering*,

391 U.S. at 568).

　　"[W]hen government employees speak or write on their own time on topics unrelated to

their employment, the speech can have First Amendment protection, absent some governmental

justification 'far stronger than mere speculation' in regulating it."  *Roe*, 543 U.S. at 80 (quoting

*NTEU*, 513 U.S. at 475).  Where a government agency cannot show that an employee's speech

---

　　　[9] Although defendants correctly note that the complaint alleges that Senator Coburn or
his staff were aware of the video (*see* Reply at 16 (citing Compl. ¶ 21)), government officials
arguably do not constitute members of the "public."  Congress has declared that "*[t]o be
effective*, the Voice of America must win the attention and respect *of listeners*" by producing
balanced and objective broadcasts.  22 U.S.C. § 6202(c) (emphasis added); *see also id.* §
1464a(b) (same with respect to BBG's television services).  The BBG's *audiences* appear to be
the only relevant "public" for purposes of gauging the efficiency of VOA's "public services."
However, even assuming that a government official's opinions should factor into the *Pickering*
analysis, it would have been "unreasonable" for defendants to act solely upon the potentially
"unreliable hearsay" from Senator Coburn or his office that plaintiff's speech rendered her unfit
for her job if, in fact, there was no evidence of a lack of fitness.  *Waters*, 511 U.S. at 677
(plurality op.) ("We think employer decisionmaking will not be unduly burdened by having
courts look to the facts as the employer *reasonably* found them to be.  It may be unreasonable,
for example, for the employer to come to a conclusion based on no evidence at all.  Likewise, it
may be unreasonable for an employer to act based on extremely weak evidence when strong
evidence is clearly available – if, for instance, an employee is accused of writing an improper
letter to the editor, and instead of just reading the letter, the employer decides what it said based
on unreliable hearsay." (emphasis in original)).

caused any "concrete harm" to the "public's confidence" in the agency's performance of its services, the mere assertion of an otherwise legitimate governmental concern cannot outweigh the employee's "interest in engaging in political debate . . . ."  *APWU*, 830 F.2d at 303-04 (holding that absent any evidence of harm, U.S. Postal Service's interest in maintaining the "public's confidence in the confidentiality of the mailstream" did not outweigh employee's First Amendment rights in writing union newsletter column which stated that he read anti-union mailings which he found while sorting the mail); *see also Pickering*, 391 U.S. at 570-71 (finding that discharge violated First Amendment where there was "no evidence" to support defendant's allegations that teacher's publication of letter criticizing school funding policy "damaged the professional reputations of the Board and the superintendent and would foment controversy and conflict among the Board, teachers, administrators, and the residents of the district"); *Rankin*, 483 U.S. at 393 n.* (Powell, J., concurring) ("[T]here is no objective evidence that [the employee's] lone comment [about hoping that any future presidential assassins would be successful] had any negative effect on the morale or efficiency of the Constable's office.").

"While there may be some situations where the circumstances and content of the speech make unequivocal its harmful effects," neither the speech at issue in *Rankin*, *APWU*, nor the video here "come close to such a situation." *APWU*, 830 F.2d at 303 n.12 (citation omitted). A music video commenting upon a politically divisive war is not a "[w]ildly irresponsible or damaging statement[]" that would, on its own, "clearly outweigh an employee's interest in freedom of expression." *Id.* at 308 n.27; *see id.* at 304 n.13 (declining to presume harm where employee's statements "dealt far more substantially with matters of public concern than did the 'employee grievance' at issue in *Connick*"). Defendants' generalized invocation of an interest in

"maintaining the public's confidence in the integrity" of the BBG and VOA is also unpersuasive

because it "shows no awareness of the particular facts of the case." *APWU*, 830 F.2d at 303 n.11

(quotation marks omitted) (rejecting agency affidavit that "spoke in general terms of the

importance of maintaining the confidentiality of the mails and emphasized that '[t]he Postal

Service places the highest priority on maintaining the public's confidence in the integrity of the

mails'" (quoting affidavit)).  The Supreme Court has explained that

> in weighing the State's interest in discharging an employee based on any claim
> that the content of a statement made by the employee somehow undermines
> the mission of the public employer, some attention must be paid to the responsibilities
> of the employee within the agency.  The burden of caution employees bear with
> respect to the words they speak will vary with the extent of authority and public
> accountability the employee's role entails.

*Rankin*, 483 U.S. at 390.

As with the clerical employee in *Rankin*, plaintiff "serve[d] no confidential,

policymaking, or public contact role" within VOA.  *Id.* at 390-91.  The *Rankin* employee worked

in a constable's office and her job did not involve representing the authority of her employer to

the public at large, even though she did have some occasional interaction with the public when

answering telephone inquiries.  *See id.* at 380-81 & n.2 (noting that she was not commissioned as

a peace officer, did not wear a uniform or carry a gun, was not authorized to make arrests, and

would never have been assigned to duties such as guarding visiting dignitaries); *see also id.* at

400 (Scalia, J., dissenting).  Similarly, plaintiff was not a journalist, but rather, she provided

support services for radio and television broadcasts.  (Compl. ¶ 17.)  She was not held out to the

public as a representative of VOA, as she never appeared on-air as a VOA worker, and her name

was never used on-air in association with her services.  (*Id.*)  *Cf. Bates v. Hunt*, 3 F.3d 374,

375 (11th Cir. 1993) (noting that employee's "public contact" job consisted of "responding to

28

letters and phone calls communicated to the Governor's office from the Governor's constituents"
and occasionally representing the Governor's office at public gatherings).  The one time plaintiff
did appear on-screen, it was in a purely private capacity as a guest interviewee with her band.
(Compl. ¶ 5.)  Given that plaintiff's music video did not identify her by name or employment, it
is unclear why anyone would have come to associate that video with VOA.  Therefore, "the
danger to the agency's successful functioning from that employee's private speech is minimal."
*Rankin*, 483 U.S. at 391.

### iii)      Balancing of interests

Because "the complaint alone sets forth the factual allegations that inform [the Court's]
review of [defendants'] motion to dismiss," the Court "find[s] a void on [defendants'] side of the
scale and the *Pickering* scale tips decisively in favor of" plaintiff.  *Mihos v. Swift*, 358 F.3d 91,
107-08 (1st Cir. 2004).  *See, e.g.*, *Am. Fed'n of Gov't Employees, AFL-CIO v. Loy*, 332 F. Supp.
2d 218, 230-31 (D.D.C. 2004) (denying motion to dismiss Transportation Safety Administration
employee's First Amendment retaliation claim based on his union organizing activities, where
defendants could not show that his activities compromised government's "significant" interest in
"[e]ffective functioning of the workforce of federal airport security screeners" or discredited
agency by being heard in public); *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250,
257-58 (6th Cir. 2006) (reversing summary judgment for school board on principal's First
Amendment retaliation claim based on his intent to speak to predominantly gay church
congregation, because his planned remarks about religion and homosexuality "did not take place
at his office or relate to his work with the Morgan County Schools in any way," and because
First Amendment did not "permit the Board effectively to terminate Scarbrough for his speech

and religious beliefs" by invoking Board members' discomfort with his willingness to associate

with homosexuals as constituting a "detrimental impact on the work environment").  *Cf. Weaver*

*v. U.S. Info. Agency*, 87 F.3d 1429, 1436 (D.C. Cir. 1996) ("[I]t is doubtful that [the BBG's

predecessor agency] could, consistent with [*Pickering*], penalize publications devoid of non-

public information, by employees with non-sensitive responsibilities (e.g. a driver, a payroll

accountant), writing in a context where their statements could not possibly be viewed as

representing the United States, simply because their publication took a view 'inconsistent with

current foreign policy.'").  The Court therefore concludes that plaintiff has properly alleged a

violation of her First Amendment rights.

### 2.      Clearly established nature of the right

To determine whether plaintiff's First Amendment right was clearly established, the

"relevant, dispositive inquiry . . . is whether it would be clear to a reasonable [official] that his

conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202.  In other words,

"the right allegedly violated must be defined at the appropriate level of specificity before a court

can determine if it was clearly established."  *Wilson v. Layne*, 526 U.S. 603, 615 (1999); *Butera*

*v. District of Columbia*, 235 F.3d 637, 646 (D.C. Cir. 2001).  At the same time, "clearly

established" does not mean that "the very action in question has previously been held unlawful . .

. ."  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Barham*, 434 F.3d at 572 ("Prior decisional law

need not have supplied a 'precise formulation' of the applicable constitutional standard in order

to overcome an official's qualified immunity . . . ." (quoting *Saucier*, 533 U.S. at 202)).  "In fact,

the Supreme Court has 'expressly rejected a requirement that previous cases be fundamentally

similar,' concluding that 'officials can still be on notice that their conduct violates established

law even in novel factual circumstances.'" *Freeman v. Fallin*, 310 F. Supp. 2d 11, 17 (D.D.C. 2004) (quoting *Hope*, 536 U.S. at 741).  The question is whether, in light of preexisting law, the officials had "fair warning that their alleged treatment of [plaintiff] was unconstitutional." *Hope*, 536 U.S. at 741; *accord Freeman*, 310 F. Supp. 2d at 17.  "'[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.'" *Hope*, 536 U.S. at 741 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).

On the facts alleged, the question that faced defendants was as follows: did plaintiff, as a contractor, have a right to speak as a private citizen, without fear of termination, about U.S. involvement in Iraq by means of a music video, made entirely on her own time and with non-work resources and which had no relationship to the subject matter of her contract?  "If the complaint is taken at face value, as [the Court] must do in light of the absence of any other source of facts, the defendants punished the plaintiff" for creating a music video about ongoing military action, "without having any legitimate reason for such punishment.  This is such an elementary violation of the First Amendment that the absence of a reported case with similar facts demonstrates nothing more than widespread compliance with well-recognized constitutional principles." *Eberhardt*, 17 F.3d at 1028.[10]  "No reasonable public official could have failed to realize" that a contractor "cannot be terminated on such grounds for [speaking] on

---

[10] In other words, "'[t]he easiest cases don't even arise.'" *Eberhardt*, 17 F.3d at 1028 (quoting *K.H. Through Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990)); *accord Lanier*, 520 U.S. at 271 (same).

matters of public concern" as a purely private citizen where there is no evidence of harm to "legitimate governmental interests." *Mihos*, 358 F.3d at 110; *see, e.g.*, *Umbehr*, 518 U.S. at 685-86; *APWU*, 830 F.2d at 303-04, 310.  For, if plaintiff's speech was wholly private and the termination of her contract was not motivated by evidence of operational inefficiency but was instead "primarily aimed at silencing [her speech] for [defendants'] own advantage, precedent would have clearly established that the balance of interests tipped decisively in plaintiff['s] favor." *Jordan v. Carter*, 428 F.3d 67, 75 (1st Cir. 2005) (affirming denial of motion to dismiss First Amendment claims); *Catletti ex rel. Catletti v. Rampe*, 334 F.3d 225, 231 (2d Cir. 2003) ("It has long been established that a government employee's right to speak on issues of public concern is protected from retaliation if the speech does not disrupt the administration of the government." (quotation marks omitted)); *see, e.g.*, *Pickering*, 391 U.S. at 571 ("[T]he only way in which the Board could conclude, absent any evidence of the actual effect of the letter [critical of the Board], that the statements contained therein were *per se* detrimental to the interest of the schools was to equate the Board members' own interests with that of the schools.").  Moreover, because "[q]ualified immunity cannot be based on a simple assertion by [defendants] without supporting evidence of the adverse effect of the speech on workplace efficiency," *Shockency v. Ramsey County*, 493 F.3d 941, 949-50 (8th Cir. 2007) (quotation marks and ellipsis omitted)), the Court must deny defendants' motion to dismiss on qualified immunity grounds "because it is premature to determine the issue . . . based only on the factual allegations in the complaint." *Olesen v. Morgan*, No. 06-CV-959, 2008 WL 5157459, at *6 (N.D.N.Y. Dec. 8, 2008) (denying motion to dismiss First Amendment *Bivens* claim); *see, e.g.*, *Gustafson v. Jones*, 117 F.3d 1015, 1021 (7th Cir. 1997) (reversing dismissal of claims on qualified immunity grounds where

pleadings "show that the speech was on a matter of public concern and they do not reveal how the [employer] might go about showing its interest in nevertheless suppressing it").  For these reasons, the complaint properly states a violation of plaintiff's clearly established rights under the First Amendment, and the individual defendants are not entitled to qualified immunity with respect to Count One.

### B.   Count Two – Fifth Amendment Equal Protection

It has long been clearly established that the Fifth Amendment prohibits federal officials from using racial criteria in their decision-making – even with respect to contractors – unless that use of race is a narrowly tailored means of furthering a compelling governmental interest.  *See, e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 235 (1995).  "The equal protection component of the Due Process Clause thus confers on [plaintiff] a federal constitutional right to be free from [racial] discrimination which cannot meet these requirements."  *Davis v. Passman*, 442 U.S. 228, 235 (1979) (footnote omitted).  The only question is whether the complaint properly states an equal protection violation.

To plead intentional discrimination in violation of equal protection principles, a plaintiff can point to an adverse government action or policy that employs racial criteria.  *See, e.g.*, *Adarand*, 515 U.S. at 227 (holding that strict scrutiny applied to government's use of race-based presumptions in identifying preferred subcontractors for government projects); *Davis*, 442 at 230-34 (holding that plaintiff stated valid equal protection claim for damages where she alleged that she was terminated "on the basis of sex").  Contrary to defendants' arguments, plaintiff has pled sufficient facts to establish direct evidence of a discriminatory intent.[11]  Plaintiff alleges that

---

[11] Defendants therefore incorrectly argue that plaintiff *must* allege indirect evidence of discriminatory purpose in the form of similarly situated individuals.  (Mot. at 15.)

Gandji subsequently informed plaintiff that her video had become "'a disproportionate problem'" for her "'since [she was] an Iranian'" working at the Persian Service, but that if she had been working at another division of VOA, then "'nothing would have happened.'"  (Compl. ¶ 20.)  In response, defendants contend that the allegation that plaintiff's contract was terminated "'solely because of the video' . . . rules out any racial motive."  (Mot. at 16 (quoting Compl. ¶ 19).)  This ignores both the context for the allegation and the contours of equal protection doctrine.

First, a fair reading of the complaint makes clear that plaintiff was alleging that her sudden termination, without the requisite notice, was "solely" due to issues related to the video and not "because of" any pre-existing dissatisfaction with her job performance.  (*See* Compl. ¶ 19.)  Indeed, the next paragraph of the complaint presents Gandji's alleged statement that the reason the video was a problem for plaintiff was in part *because of* her race, implying that if plaintiff had not been Persian or born in Iran, her contract would not have been terminated.[12]  (*Id.* ¶ 20.)  Second, equal protection doctrine "does not require a plaintiff to prove that the challenged action rested *solely* on racially discriminatory purposes."  *Arlington Heights*, 429 U.S. at 265 (emphasis added).  "Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one."  *Id.* (footnote omitted).  It is enough if there is "proof that a discriminatory purpose has been *a motivating factor* in the decision . . . ."  *Id.* at 265-66 (emphasis added).

---

[12] Contrary to defendants' suggestion (*see* Reply at 17), the complaint's allegation that Senator Coburn lobbied BBG officials to punish anyone "affiliated with the video" (Compl. ¶ 21) is not inconsistent with the allegation that once plaintiff was identified as affiliated with the video, defendants were motivated to terminate her contract in part because of her race.

Judged against these standards, the Court concludes that the allegations are sufficient to state a violation of plaintiff's clearly established rights under the Fifth Amendment, *see Davis*, 442 U.S. at 244, and therefore, the individual defendants are not entitled to qualified immunity with respect to Count Two.

## V.      AVAILABILITY OF *BIVENS* REMEDY

Defendants have also moved to dismiss on the ground that plaintiff's request for monetary relief is not cognizable under *Bivens*. In *Bivens*, the Supreme Court "'established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right.'" *Hartman*, 547 U.S. at 254 n.2 (quoting *Carlson v. Green*, 446 U.S. 14, 18 (1980)). As a general matter, "a *Bivens* action is the federal analog to suits brought against state officials under . . . 42 U.S.C. § 1983." *Id.* Although *Bivens* was decided under the Fourth Amendment, the Court expanded the principle in *Davis v. Passman*, holding that the Fifth Amendment's Due Process Clause created a right of action for damages where a woman had been discharged from her employment with a congressman because of her gender, and in *Carlson v. Green*, holding that a prisoner's estate could seek damages from prison officials for Eighth Amendment violations. *See* 446 U.S. at 23-24.

Although the Supreme Court "has been reluctant to extend *Bivens* liability 'to any new context or new category of defendants'" because "implied causes of action are disfavored," *Iqbal*, 129 S. Ct. at 1948 (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001)), the Court has not "abandoned *Bivens*," nor has the Court concluded "that no situation merits its extension . . . ." *Munsell v. Dep't of Agric.*, 509 F.3d 572, 591 (D.C. Cir. 2007) (rejecting view

of a minority of Justices that "*Bivens* is a 'relic'" (quoting *Wilkie v. Robbins*, 551 U.S. 537, 568

(2007) (Thomas, J., joined by Scalia, J., concurring)).  In recent years, the Court has assumed

without deciding that *Bivens* actions are also possible for First Amendment claims.  *See*

*Hartman*, 547 U.S. at 252 (establishing pleading standards in *Bivens* action based on allegedly

retaliatory prosecution for speech critical of government agency); *Iqbal*, 129 S. Ct. at 1948

(assuming without deciding that Free Exercise Clause claim was actionable under *Bivens*).  The

D.C. Circuit has also concluded that plaintiffs could recover under *Bivens* for retaliation in

violation of the First Amendment.  *See Haynesworth v. Miller*, 820 F.2d 1245, 1255 (D.C. Cir.

1987) ("We agree that the [plaintiff's] retaliatory prosecution constitutes an actionable First

Amendment wrong redressable under *Bivens* . . . ." (footnote omitted)), *overruled in part on*

*other grounds by Hartman*, 547 U.S. at 256; *Dellums v. Powell*, 566 F.2d 167, 195 (D.C. Cir.

1977) (recognizing *Bivens* action for violation of First Amendment right to petition Congress for

redress of grievances).

　　　　Thus, in principle, a "vengeful [federal] officer" who engages in unconstitutional

retaliation "is subject to an action for damages on the authority of *Bivens*," *Hartman*, 547 U.S. at

256, as is a federal official who discharges a member of the federal workforce because of that

individual's constitutionally protected status.  *See Davis*, 442 U.S. at 248-49.  Nonetheless, the

question of whether to recognize a *Bivens* remedy is context-specific.  *See FDIC v. Meyer*, 510

U.S. 471, 484 n.9 (1994) ("For example, a *Bivens* action alleging a violation of the Due Process

Clause of the Fifth Amendment may be appropriate in some contexts, but not in others.").  In

order to determine whether to recognize a *Bivens* remedy in a particular situation, courts must

ask two questions.  *See Wilkie*, 551 U.S. at 550.  The first question is "whether any alternative,

existing process for protecting the [plaintiff's constitutionally protected] interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Id.* Such a process exists where "Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective." *Carlson*, 446 U.S. at 18-19 (emphasis in original); *accord Wilson v. Libby*, 535 F.3d 697, 708 (D.C. Cir. 2008). Second, even absent an equally effective alternative remedy, the decision to recognize a *Bivens* remedy "is a subject of judgment," such that "'federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation.'" *Wilkie*, 551 U.S. at 550 (quoting *Bush v. Lucas*, 462 U.S. 367, 378 (1983)). These "special factors" are present, for example, where the conduct underlying the plaintiff's claim is already "governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States," such that it would be "inappropriate . . . to supplement that regulatory scheme with a new judicial remedy." *Bush*, 462 U.S. at 368.

Defendants do not appear to argue that there are "alternative remed[ies]" that Congress has declared to be preclusive of, and as "equally effective" as, *Bivens* remedies.[13] They only address the second step of the *Bivens* analysis, arguing that the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601-613, and the judicial review provisions of the Administrative Procedure Act

---

[13] To the extent that defendants have on occasion conflated the first and second steps of the *Bivens* analysis (*see* Mot. at 7 (discussing "alternative remedies" as "special factors")), the Court concludes that under the first step of the *Bivens* analysis, the CDA and the APA are not alternative remedies, as defined by *Carlson*, 446 U.S. at 18-19, for protecting plaintiff's constitutional rights. *See generally infra* Sections V.A, V.B, and V.C.1.

("APA"), 5 U.S.C. §§ 701-706, are comprehensive regulatory regimes that constitute "special factors" counseling against the recognition of *Bivens* remedies for plaintiff's claims.[14]   The Court disagrees.

### A.     The CDA

Even if it is assumed that the CDA is a comprehensive regulatory scheme that could preclude certain *Bivens* claims, this does not mean that it necessarily precludes plaintiff's particular claim.   The Supreme Court "has provided few, if any, principles governing whether a particular claimant – and [her] underlying claim – should be included in a given congressional 'comprehensive system' for purposes of applying 'special factors' analysis."   *Spagnola v. Mathis*, 859 F.2d 223, 229 (D.C. Cir. 1988) (*en banc*).   Nonetheless, the law of this circuit clarifies that the CDA is inapplicable to the present dispute, because plaintiff's claim does not relate to the terms of her contract and is founded instead upon the protections of the First and Fifth Amendments.

The CDA was enacted in 1978 to streamline the procedures for resolving government contract disputes and to help "induce resolution of more contract disputes by negotiation prior to litigation; equalize the bargaining power of the parties when a dispute exists; provide alternate forums suitable to handle the different types of disputes; and insure fair and equitable treatment to contractors and government agencies."   S. Rep. No. 95-1118 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5235, 5235-37.   The CDA applies to contracts entered into by executive agencies for, *inter alia*, "the procurement of services."   41 U.S.C. § 602(a)(2).   It provides that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall

---

[14] It is undisputed that because plaintiff is a contractor and not an employee, the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111, has no application here.   (*See* Opp'n at 10; Reply at 3.)

be submitted to the contracting officer for a decision" within six years after the claim's accrual. *Id.* § 605(a).  After the issuance of a written decision, the contractor may take an appeal to the agency's board of contract appeals; the board's decision may then be appealed to the U.S. Court of Appeals for the Federal Circuit.  *See id.* §§ 606 & 607(g)(1)(A).  In the alternative, the contractor may, within twelve months of receiving the contracting officer's decision, "bring an action directly on the claim in the United States Court of Federal Claims."  *Id.* § 609(a).

When the CDA applies to a claim, its procedures provide the exclusive remedy for that dispute, and this Court lacks jurisdiction to hear it.  *See* 28 U.S.C. § 1346(a)(2); *A & S Council Oil Co. v. Lader*, 56 F.3d 234, 241-42 (D.C. Cir. 1995); *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 4 (D.C. Cir. 1998).  However, the CDA does not define the type of "claim" that it governs.  *See generally* 41 U.S.C. § 601.  For guidance, courts consider "the [Federal Acquisition Regulation ("FAR")] implementing the CDA, the language of the contract in dispute, and the facts of the case."  *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575 (Fed. Cir. 1995); *see also United States v. Intrados/Int'l Mgmt. Group*, 277 F. Supp. 2d 55, 65 n.7 (D.D.C. 2003).  FAR 2.101 defines a claim as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief *arising under or relating to* the contract."  48 C.F.R. § 2.101 ("Definitions") (emphasis added); *see also id.* § 52.233-1 ("Disputes").

"'[C]lassification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claim, and upon the type of relief sought (or appropriate).'"  *Commercial Drapery*, 133 F.3d at 4 (quoting

*Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)); *see, e.g.*, *SRS Techs. v. United States*, 843 F. Supp. 740, 742 (D.D.C. 1994) (rejecting CDA's applicability and asserting jurisdiction where case rested "on issues of regulatory law, not contract law").  The fact that plaintiff alleges that defendants "us[ed] [their] contracting powers as a means to retaliate" or discriminate against her does not transform her claim into one arising under or relating to her contract.  *Ervin and Assoc., Inc. v. Dunlap*, 33 F. Supp. 2d 1, 12 (D.D.C. 1997); *see, e.g.*, *Commercial Drapery*, 133 F.3d at 4 (rejecting CDA's applicability to plaintiffs' claim where dispute over contract clause was "embedded within [their] broader claim" that agency had unconstitutionally "blacklist[ed]" them).  Instead, the Court must consider whether "it is possible to conceive of this dispute as entirely contained within the terms of the contract."  *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77-78 (D.C. Cir. 1985).  It is not possible to do so here, because there is no question of "whether the contract forbids termination . . . ." *Id.*  Rather, there is only a question of whether the Constitution forbids it.  *See also SRS Techs.*, 843 F. Supp. at 742 (rejecting CDA's applicability because "[w]hat makes this [agency] action unlawful is not contract law").  Plaintiff's position "is ultimately based not on breach of contract, but on an alleged governmental infringement'" of constitutional rights "'which preexisted any contracts.'" *Megapulse*, 672 F.2d at 969 & n.47 (quoting district court).[15]

---

[15] The issues raised by the complaint are therefore not "within the unique expertise of the Court of Claims." *Ingersoll-Rand*, 780 F.2d at 78; *cf. SRS Techs.*, 843 F. Supp. at 743 ("[T]his case centers on the interpretation of regulations, a skill district courts are particularly well-suited to perform, and not on any specialized or arcane knowledge of government contracts.").  To the contrary, the Court of Federal Claims has expressly disavowed any such expertise over constitutional torts.  *See Ayres v. United States*, 66 Fed. Cl. 551, 560 (Fed. Cl. 2005) (dismissing, for lack of jurisdiction, claims against individual agency officials because "[c]laims for alleged wrongful conduct by governmental officials in their official capacity are tort claims over which this court does not have jurisdiction," and citing *Bivens*); *see also Brown v. United States*, 105 F.3d 621, 624 (Fed. Cir. 1997) ("The Tucker Act grants the [United States] Court of Federal

Nor is the relief that plaintiff seeks essentially contractual in nature.  For example, she does not seek specific performance of her contract; rather, she seeks a declaration that defendants' actions were unconstitutional and an injunction preventing them from further retaliating against her, neither of which the Court of Claims may issue.  *See Megapulse*, 672 F.2d at 967.  Plaintiff also seeks compensatory damages for reputational and emotional injury, as well as punitive damages for malicious and willful violation of her constitutional rights, "in an amount to be proven at trial."  (Compl. at 11 ¶ (3); *see also* Pl.'s Surreply to Mot. [Dkt. 24] at 14 (citing *Carlson*, 446 U.S. at 22 (indicating availability of punitive damages in *Bivens* actions).) *Cf. Megapulse*, 672 F.2d at 969 & n.48 (noting that plaintiff sought no monetary damages from the United States and only from agency officers "in their individual capacities").  Because plaintiff seeks damages that cannot be ascertained by reference to her contract nor "'easily determined by a simple mathematical calculation,'" *United Constructors, LLC v. United States*, No. 08-CV-757, 2009 WL 875358, at *6 (Fed. Cl. Mar. 27, 2009) (quoting *Metric Constr. Co. v. United States*, 14 Cl. Ct. 177, 179 (1988)), her claim is not covered by the FAR's definition of a "claim" as a demand for a monetary payment "'in a sum certain.'"  *Id.* (quoting 48 C.F.R. § 2.101).

For these reasons, plaintiff's claim is not the type of "claim" governed by the CDA.  As a result, the CDA does not preclude *Bivens* recovery for plaintiff's claims.[16]

_____

Claims jurisdiction over suits against the United States, not against individual federal officials.").

[16] This conclusion is consistent with the decisions cited by defendants where the CDA was found to preclude *Bivens* actions brought on constitutional due process grounds.  Unlike the contract at issue here, the contracts in those decisions were the sources of the plaintiffs' asserted rights.  *See Evers v. Astrue*, 536 F.3d 651, 658 (7th Cir. 2008) ("[I]t is clear that the source of the procedural due process claims was really [plaintiff's] SSA contract . . . ."); *Janicki Logging Co. v. Mateer*, 42 F.3d 561, 564-66 (9th Cir. 1994) (finding that core of plaintiff's claim was

B.      The APA

Defendants also argue that the APA precludes plaintiff's ability to seek a *Bivens* remedy

because plaintiff could bring an action against the BBG and its personnel in their official

capacities seeking judicial review of her contract's termination as an unconstitutional "agency

action."  *See* 5 U.S.C. §§ 702, 706(2)(B).  (*See* Mot. at 8-9; Reply at 5-6.)  As an initial matter,

the Court notes that this is not the paradigmatic APA case where a claimant with an arm's-length

relationship to the agency seeks to challenge a decision made as a disinterested exercise of the

sovereign's regulatory powers.  Rather, plaintiff was a member of the agency's workforce, and

she challenges the agency's act of terminating her contract in its capacity *as an employer*.  This

distinction echoes *Pickering*'s own underlying distinction between the government's efforts to

regulate speech in its role as sovereign and its efforts to regulate speech when acting as an

employer.  *See Waters*, 511 U.S. at 671.  Here, no statute specifically addresses the substance of

plaintiff's quasi-employment relationship to defendants as a personal services contractor.  Thus,

even if the termination of plaintiff's contract were a reviewable "agency action," the APA's

judicial review mechanism, standing alone, does not constitute a "special factor" that would bar

---

contractual because, *inter alia*, "the source of its claim to the timber was a contract"); *Info. Sys. & Networks Corp. v. U.S. Dep't of Health and Human Servs.*, 970 F. Supp. 1, 5 (D.D.C. 1997) (finding that case was "essentially one sounding in contract" because "[t]he core" of plaintiff's claim was "the government's failure to extend [plaintiff] another option, a clear contractual issue").

The only case resembling plaintiff's is *Teel v. Di Leonardi*, No. 98-CV-2568, 1999 WL 133997, at *3 (N.D. Ill. Mar. 5, 1999).  There, the district court stated in *dicta* that even if the plaintiff had not been a federal employee whose *Bivens* claim for First Amendment retaliation had been precluded by the CSRA but had instead been a federal contractor, his claims would nonetheless have been precluded by the CDA.  *Id. Teel*'s analysis is unpersuasive and appears to have been based on the incorrect premise that the CDA is "like the CSRA" in its application to the relationship between federal entities and the providers of personal services.  *Id.*; *see also supra* note 14.

plaintiff's *Bivens* action.

Neither the Supreme Court nor the D.C. Circuit has ever held that the APA precludes the availability of a *Bivens* remedy.  To the contrary, *Wilkie* found that the availability of APA review, as part of a "patchwork" of statutes and regulations, did not preclude *Bivens* recovery on a Takings Clause claim because it was not possible to infer that "Congress expected the Judiciary to stay its *Bivens* hand . . . ."  *Wilkie*, 551 U.S. at 554.  Subsequently, the D.C. Circuit assumed without deciding in *Munsell* that the APA did not preclude the plaintiffs there, who had been participants in a regulated industry, from seeking *Bivens* remedies for their claims of First Amendment retaliation by agency officials.  509 F.3d at 591-92.  In so doing, the D.C. Circuit rejected the categorical rule of preclusion that other circuits had applied in pre-*Wilkie* decisions. *See id.* at 589-90 (disapproving of *Neb. Beef, Ltd. v. Greening*, 398 F.3d 1080, 1084 (8th Cir. 2005)); *accord Duxbury Trucking, Inc. v. Mass. Highway Dep't*, No. 04-CV-12118, 2009 WL 1258998, at *5 (D. Mass. Apr. 29, 2009) (citing *Munsell*'s disagreement with other circuits and concluding that APA did not preclude *Bivens* recovery from Department of Transportation employees).

The question here is whether the APA is a "congressional 'comprehensive system' for purposes of applying 'special factors' analysis."  *Spagnola*, 859 F.2d at 229.  In *Spagnola*, the D.C. Circuit *en banc* declined to create a *Bivens* remedy for federal employees' claims of First Amendment retaliation because by enacting the CSRA, "Congress has put in place a comprehensive system to administer public rights . . . ."  859 F.2d at 228.  This conclusion was based on the Court of Appeals' reading of the Supreme Court's decisions in *Bush* and *Schweiker v. Chilicky*, 487 U.S. 412 (1988).  In *Bush*, the Court declined to create a *Bivens* remedy for a

federal employee's claim of constitutional violations, because although Congress had not

provided the plaintiff "with an equally effective substitute," 462 U.S. at 378, his employment

relationship was governed by "comprehensive procedural and substantive provisions giving

meaningful remedies against the United States," which Congress had recently supplemented

through passage of the CSRA.  *Id.* at 368, 385-86 & n.25.  The Court noted that "[f]ederal civil

servants are now protected by an elaborate, comprehensive scheme that encompasses substantive

provisions forbidding arbitrary action by supervisors and procedures – administrative and

judicial – by which improper action may be redressed."  *Id.* at 385.  *Schweiker* similarly

concluded that the Social Security Act's statutory entitlements and procedural safeguards

precluded the plaintiffs' pursuit of *Bivens* remedies for alleged due process violations related to

the wrongful denials of their disability benefits.  487 U.S. at 428-29.  The Court noted that both

*Bush* and *Schweiker* involved requests for "consequential damages for hardships resulting from

an allegedly unconstitutional *denial of a statutory right* (Social Security benefits in one instance

and employment in a particular Government job in the other)."  487 U.S. at 428 (emphasis

added); *see also id.* (noting that the "comprehensive statutory schemes" at issue made it

impossible to separate "the harm resulting from the alleged constitutional violation . . . from the

harm resulting from the denial of the statutory right").  *Schweiker* explained that recovery under

*Bivens* is inappropriate "[w]hen the design of a Government program suggests that Congress has

provided what it considers adequate remedial mechanisms for constitutional violations that may

occur in the course of its administration . . . ."  487 U.S. at 423.

These discussions of specific entitlement programs suggest that for purposes of the

special factors analysis, a statutory scheme is a comprehensive congressional "system to

administer public rights" when it provides both substantive rights and administrative procedures for adjudicating those rights.  *Cf. Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 55 n.10 (1989) (characterizing as "public rights" those "statutory rights that are integral parts of a public regulatory scheme and whose adjudication Congress has assigned to an administrative agency or specialized court of equity").  Congress's provision of substantive rights *and* procedural remedies has been a defining feature of the other regulatory schemes that the D.C. Circuit has held to preclude *Bivens* recovery.  *See Ethnic Employees of Library of Cong. v. Boorstin*, 751 F.2d 1405, 1414-16 (D.C. Cir. 1985) (workplace discrimination under Title VII of the Civil Rights Act of 1964); *Johnson v. Executive Office for U.S. Attorneys*, 310 F.3d 771, 777 (D.C. Cir. 2002) (access to government documents under Freedom of Information Act); *Chung v. U.S. Dep't of Justice*, 333 F.3d 273, 274 (D.C. Cir. 2003) (privacy in personal information collected by government agencies under Privacy Act), *aff'g in relevant part* No. 00-CV-1912, 2001 WL 34360430 (D.D.C. Sept. 20, 2001); *Thomas v. Principi*, 394 F.3d 970, 975-76 (D.C. Cir. 2005) (veterans benefits under Veterans' Judicial Review Act).

Unlike those statutory systems, the APA does not establish a government program that administers substantive rights.  *Cf. Schweiker*, 487 U.S. at 423.  It was enacted to define the uniform procedures that agencies could employ when administering public rights established in other statutes and to provide for judicial review of that administration.  *See* Attorney General's Manual on the Administrative Procedure Act 9 (1947).  However, the APA itself does not "confer a substantive right to be free from arbitrary agency action," *Furlong v. Shalala*, 156 F.3d 384, 394 (2d Cir. 1998), nor does it create any other substantive right that might be violated.  *See Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 n.14 (5th Cir. 1998) ("[T]he provisions of

the APA 'do not declare self-actuating substantive rights . . . .'" (quoting *Perales v. Casillas*, 903

F.2d 1043, 1050 n.4 (5th Cir. 1990)); *El Rescate Legal Servs. v. Executive Office of Immigration*

*Review*, 959 F.2d 742, 753 (9th Cir. 1991) ("Section 702 does not create substantive rights.");

*Buckeye Cablevision, Inc. v. United States*, 438 F.2d 948, 953 n.2 (6th Cir. 1971) ("Section 10(e)

of the Administrative Procedure Act (5 U.S.C. § 706) . . . does not bestow any substantive rights

upon parties to administrative action."). "The APA is merely a procedural vehicle for review of

agency action," *Furlong*, 156 F.3d at 394, in that its provisions "'merely provide a vehicle for

enforcing rights which are declared elsewhere.'" *Stockman*, 138 F.3d at 151 n.14 (quoting

*Perales*, 903 F.2d at 1050 n.4).

It is true that the APA's judicial review provisions *in conjunction with* substantive

statutory schemes might resemble the sort of "'elaborate remedial system . . . constructed step by

step, with careful attention to conflicting policy considerations'" that would reflect congressional

judgments about "the type and magnitude of relief" that should be available for a particular

substantive claim. *Wilson*, 535 F.3d at 705 (quoting *Bush*, 462 U.S. at 388). But there is no

statutory regime that "affirmatively speaks" to the substance of the action underlying plaintiff's

claims for retaliatory and discriminatory termination of her personal services contract. *Spagnola*,

859 F.2d at 229 (noting that CSRA "condemn[ed] the underlying actions as 'prohibited

personnel practices'"). It therefore cannot be said that the APA's solely procedural provisions

represent an "elaborate" or "careful" congressional judgment about the type of relief that should

be available for specific substantive quasi-employment claims akin to those governed by the

CSRA. *See Grosdidier v. Chairman, Broad. Bd. of Gov'rs*, 560 F.3d 495, 497 (D.C. Cir. 2009)

(contrasting CSRA and its "comprehensive" protections and remedies for federal employees with

46

"the catchall APA"); *Harrison v. Bowen*, 815 F.2d 1505, 1516 n.25 (D.C. Cir. 1987) (contrasting

CSRA's "detailed" and "extensive scheme regulating civil service personnel decisions" with "the

more general APA" (quotation marks omitted)).

The relevance of this distinction between the APA alone and the APA paired with

substantive statutory rights is confirmed by the D.C. Circuit's decision in *Krodel v. Young*, 748

F.2d 701 (D.C. Cir. 1984). *Krodel* held that *Bush* barred a federal employee "from seeking

[F]irst [A]mendment damages from his superiors in a dispute arising out of his employment

relationship." *Id.* at 711. The D.C. Circuit explained that the employment relationships at issue

in both *Krodel* and *Bush* were "covered by the collection of statutes, executive orders and

regulations" governing federal employees that preceded the CSRA's passage in 1978. *Id.* at 712

n.6; *see also Bush*, 462 U.S. at 385-88 & nn.25-30.[17]  That collection of substantive authorities,

which permitted civil service employees to seek back pay, lost benefits, and other relief, *see*

*Bush*, 462 U.S. at 386 n.25, gave the plaintiffs in *Krodel* and *Bush* "meaningful remedies against

the government for a free speech related claim arising out of [their] employment relationship[s]"

by filing internal agency grievances and seeking judicial review under the APA. *Krodel*, 748

F.2d at 712. It was thus the APA *along with* the existing civil service statutes that provided

_____

[17] The cases cited by defendants that involved individual personal service providers are distinguishable on similar grounds. *See Gleason v. Malcom*, 718 F.2d 1044, 1048 (11th Cir. 1983) (holding that *Bivens* action brought by civil service employee was precluded by existing civil service regime in light of *Bush*); *Custodio v. United States*, 866 F. Supp. 479, 482 (D. Colo. 1994) (APA precluded physician's *Bivens* action alleging that termination of his employment at military hospital violated due process, where employment relationship was governed by military health care program established pursuant to 10 U.S.C. § 1071 *et seq.*); *Moore v. Glickman*, 113 F.3d 988, 991-92 (9th Cir. 1997) (APA precluded *Bivens* claim brought by county employee of local committee formed by federal agency, where Congress "explicitly recognized [such] employees' unique status" and "chose[] to grant them only selective employment rights" through various statutes granting severance pay, retirement system participation, insurance benefits, and annual leave rights).

Krodel a "comprehensive statutory forum for his free speech claims," *id.*, a fact that the D.C. Circuit reiterated in *Sloan v. Department of Housing & Urban Development*, 231 F.3d 10, 19 (D.C. Cir. 2000) ("This court has suggested that a *Bivens* action may be foreclosed where the possibility of judicial review under the APA, *along with* other 'statutes, executive orders and regulations,' provides a meaningful remedy" (quoting *Krodel*, 748 F.2d at 712 n.6) (emphasis added)).

Given *Bush* and *Krodel*'s emphasis on the civil service laws that addressed the substance of the plaintiffs' relationships with the defendants, it is clear that the Supreme Court and D.C. Circuit did not view the APA as sufficient on its own to preclude the First Amendment retaliation *Bivens* claims at issue in those cases.  If they had viewed it as *per se* preclusive, then the Supreme Court performed a wholly superfluous inquiry into the history and evolution of the civil service system, *see generally Bush*, 462 U.S. at 381-89, and labored unnecessarily towards the eventual conclusion that "[c]onstitutional challenges to agency action, such as the First Amendment claims raised by petitioner, are fully cognizable within this [civil service] system." *Id.* at 386.

In view of the statutory schemes at issue in *Bush*, *Schweiker*, *Krodel*, and *Spagnola*, the Court cannot accept defendants' invitation to expand the definition of a "comprehensive system to administer public rights" so that it includes the APA.  Nor is the Court inclined to disregard the recent suggestions by *Wilkie* and *Munsell* that the APA's existence does not automatically preclude *Bivens* remedies.  It therefore concludes that under step two of the *Bivens* analysis, the APA, standing alone, is not a comprehensive system for administering public rights that would constitute a "special factor" counseling against recognition of plaintiffs' *Bivens* claims.

48

### C.        Common-Law Balancing Test

"[A]ny freestanding damages remedy for a claimed constitutional violation has to

represent a judgment about the best way to implement a constitutional guarantee; it is not an

automatic entitlement no matter what other means there may be to vindicate a protected interest .

. . ." *Wilkie*, 551 U.S. at 550.  The Court must "weigh[] reasons for and against the creation of a

new cause of action, the way common law judges have always done."  *Id.* at 554; *see Munsell*,

509 F.3d at 590-91 (engaging in balancing inquiry where claim implicated APA); *Duxbury*

*Trucking*, 2009 WL 1258998, at *5 (same).

### 1.        Plaintiff has no other "meaningful remedies."

"'Historically, damages have been regarded as the ordinary remedy for an invasion of

personal interests in liberty.'"  *Davis*, 442 U.S. at 245 (quoting *Bivens*, 403 U.S. at 395).  The

strongest reason for recognizing a *Bivens* action in this instance is that the only "meaningful

remedies" available to plaintiff are monetary damages.  *Bush*, 462 U.S. at 368; *Krodel*, 748 F.2d

at 712.

Defendants suggest that plaintiff should have brought this action as one for judicial

review under § 706 of the APA.  The APA only permits equitable relief, because its sovereign

immunity waiver does not extend to the award of monetary damages against the United States.

*See* 5 U.S.C. § 702.  The only equitable relief that plaintiff seeks is a declaration that her rights

were violated and an order "enjoin[ing] [defendants] from further violations of plaintiff's rights."

(Compl. at 11 ¶¶ 1-2.)  Because plaintiff no longer works for the BBG, such an injunction would

do nothing to address the harms allegedly caused by defendants' *past* unconstitutional action.

The remedial regimes at issue in *Bush* and *Schweiker*, which were deemed to provide

"meaningful remedies against the United States," *Bush*, 462 U.S. at 368, offered the prospect of monetary compensation for the claimed economic harms.  *See id.* at 386 & n.25 (discussing statutes permitting civil service employees to recover back pay and lost benefits); *Schweiker*, 487 U.S. at 424 (citing statutory and regulatory scheme for seeking restoration of Social Security benefits).  Similarly, the CSRA gives federal employees a statutory entitlement to back pay for "unjustified or unwarranted personnel action[s]."  5 U.S.C. § 5596(b)(1).  Here, no statute specifically addresses the quasi-employment relationship between federal entities and personal services contractors such as plaintiff.  And under the "catchall APA," *Grosdidier*, 560 F.3d at 497, no monetary compensation is available for any of plaintiff's alleged harms, whether economic, reputational, or emotional.  *See Hubbard v. Adm'r, E.P.A.*, 982 F.2d 531, 538-39 (D.C. Cir. 1992) (*en banc*) (holding that APA does not permit federal employees to seek back pay as equitable relief).

Notably, defendants neither suggest nor concede the availability of any backward-looking equitable relief.  (*See* Reply at 6 n.2.)  Indeed, the termination of plaintiff's contract severed the only relationship she had to the BBG.  Thus, unlike plaintiffs in a traditional APA review case, who are part of a regulated industry or are otherwise affected by regulatory action, the instant plaintiff is no longer subject to the agency's authority.  "The only viable relief" for personal service contractors such as plaintiff, "who allegedly have been driven from business by the retaliatory actions of agency officials, would be backward-looking damages claims." *Munsell*, 509 F.3d at 590.

It is no response for defendants to suggest the novel idea[18] that plaintiff, who does not

seek reinstatement, should be required to seek an order compelling defendants to "set aside" the

termination of her contract as an unconstitutional "agency action." *See* 5 U.S.C. § 706(2)(B).

First, it is unclear whether the APA permits a court to order the reinstatement of a personal

services contract. Second, the complaint suggests that plaintiff's position is no longer available.

(*See* Compl. ¶ 24 (alleging that defendants hired other contractors to perform "the very same

services" previously performed by plaintiff).) Third, "the propriety of particular forms of

equitable relief should be determined . . . 'according to the distinctive historical traditions of

equity as an institution,'" *Reuber v. United States*, 750 F.2d 1039, 1061 (D.C. Cir. 1984)

(quoting *Bivens*, 403 U.S. at 404 (Harlan, J., concurring)), *abrogated on other grounds by*

*Kauffman v. Anglo-American School of Sophia*, 28 F.3d 1223 (D.C. Cir. 1994), and in this

regard, "[t]he common law traditionally disfavored specific performance of [personal services]

contracts precisely to avoid the friction and the social costs that may result when employer and

employee are forcibly reunited in a relationship that has already failed." *Id.* at 1066 (Bork, J.,

concurring).

Therefore, no matter how "the existence of APA review might factor into a determination

as to whether a *Bivens* remedy is available," its relevance is "minimal" in a case "involving [a]

---

[18] No court appears to have analyzed in detail whether the APA would permit reinstatement of a non-employee's personal services contract with an agency. *Compare Custodio*, 866 F. Supp. at 482-83 (concluding without discussion that APA permitted "reversal of agency action" where employee, whose employment relationship was governed by military health care program created pursuant to statute, claimed agency deprived him of due process when terminating his employment contract), *aff'd on other grounds*, 65 F.3d 178, 1995 WL 523123, at *3 (10th Cir. 1995) (disposing of plaintiff's claim because "he had no property interest entitled to procedural due process protection," thus "preclud[ing] the need to address plaintiff's *Bivens / APA* argument").

claimant[] who [is] ineligible for relief under the APA." *Munsell*, 509 F.3d at 590.  Plaintiff is just such a claimant.  For her, "no other alternative forms" of meaningful judicial relief are available, and "'it is damages or nothing.'"  *Davis*, 442 U.S. at 245 (quoting *Bivens*, 403 U.S. at 410 (Harlan, J., concurring in the judgment).

## 2.  Plaintiffs' claims are judicially manageable.

Plaintiff's claims of discrimination and retaliation are readily "judicially manageable," because they present "focused remedial issue[s] without difficult questions of valuation or causation."  *Davis*, 442 U.S at 245.  In *Wilkie*, which declined to recognize a *Bivens* action for retaliation under the Fifth Amendment's Takings Clause because of the "difficulty in defining a workable cause of action," the Court quoted *Umbehr* when explaining that by contrast, First Amendment (and other) retaliation cases

> turn on an allegation of impermissible purpose and motivation; an employee who spoke out on matters of public concern and then was fired, for example, would need to "prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination."  In its defense, the Government may respond that the firing had nothing to do with the protected speech, or that "it would have taken the same action even in the absence of the protected conduct."  In short, the outcome turns on "what for" questions: what was the Government's purpose in firing him and would he have been fired anyway?  Questions like these have definite answers, and we have established methods for identifying the presence of an illicit reason (in competition with others), not only in retaliation cases but on claims of discrimination based on race or other characteristics.

551 U.S. at 556 (quoting 518 U.S. at 675); *accord Munsell*, 509 F.3d at 589 (discussing *Wilkie*); *Dellums*, 566 F.2d at 195 (discussing administrability of First Amendment claims for damages).

## 3.  Defendants' concerns are not persuasive.

On the other side of the scale, defendants contend that creating a *Bivens* remedy would disrupt federal agencies' ability to manage contracts featuring at-will termination rights, because

"[c]ontractors could leverage potential litigation as a tool of intimidation, and the prospect of defending a lawsuit would give employees a strong incentive to acquiesce to the contractor's demands" without regard for "whether the contractual relationship serves the government's interest."  (Reply at 9-10.)  Defendants also suggest that "creating a new *Bivens* remedy for federal contractors who challenge the grounds for the termination or modification of their contracts could generate an unmanageable volume of litigation," because it would "open the floodgates to potential *Bivens* challenges by federal contractors, and weeding out the unmeritorious claims would expend considerable judicial resources."  (*Id.* at 11.)

In response, it must be noted that 42 U.S.C. § 1983 "serves similar [deterrent] purposes" as the *Bivens* doctrine, *Carlson*, 446 U.S. at 21 n.6, and that contractors have long been able to pursue § 1983 actions against state officials for First Amendment retaliation.  *See, e.g.*, *Umbehr*, 518 U.S. at 672; *O'Hare Truck*, 518 U.S. at 716.  Nor is the Court persuaded by defendants' prediction that the availability of a *Bivens* remedy will overwhelm the courts, since the *Bivens* remedy being recognized is limited to the situation of an individual personal services contractor who alleges termination in violation of freedom of speech or equal protection principles. Confined to this quasi-employment context and these particular constitutional violations, the prospect of monetary damages will provide the appropriate deterrent effect, tempered by the protection that qualified immunity provides government officials against frivolous claims. *Carlson*, 446 U.S. at 19, 21 & n.7.[19]

---

[19] Given the narrow scope of the *Bivens* action being recognized, the Court's holding does not apply to claims of the type at issue in the remaining cases that defendants cite for the proposition that the APA precludes a *Bivens* remedy.  These cases involved paradigmatic APA challenges to agency exercises of regulatory powers. *See GasPlus, L.L.C. v. U.S. Dep't of Interior*, 466 F. Supp. 2d 43, 47-50 (D.D.C. 2006) (declining to recognize *Bivens* claim for due process violation arising from invalidation of tribal business management agreement, where

Accordingly, for the foregoing reasons, the Court concludes that plaintiff has properly stated a claim under *Bivens* against the individual defendants.

## CONCLUSION

The individual defendants' motion to dismiss will be denied, except to the extent that it is granted on the grounds that plaintiff had not yet served defendants Glassman, Poggioli, and Rice at the time the motion was filed.  A separate order accompanies this Memorandum Opinion.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

DATE: September 3, 2009

---

initial decision allegedly "lacked findings of fact and was reached without notice to GasPlus and without providing GasPlus a meaningful opportunity to be heard"); *Sky Ad v. McClure*, 951 F.2d 1146, 1148 (9th Cir. 1991) (affirming dismissal of *Bivens* claims for due process violation arising from rulemaking where legislative history of both APA and FTCA showed that "Congress indicated that tort damages were an inappropriate remedy for unconstitutional rulemaking"); *W. Radio Co. v. U.S. Forest Serv.*, 2008 WL 427787, at *4-*5 (D. Or. Feb. 12, 2008) (APA precluded plaintiffs' *Bivens* action for unlawful delay in processing their special use application, where application was governed by agency regulations, plaintiffs had access to agency's administrative remedies pursuant to those regulations, and they "present[ed] no evidence to suggest retaliation . . . on the part of individual defendants"), *aff'd*, No. 08-35186, 2009 WL 2568706, at *1 (9th Cir. Aug. 21, 2009).